**CITY OF ST. PAUL, a Municipal Corporation, Appellant,**

v.

**CHICAGO, ST. PAUL, MINNEAPOLIS AND OMAHA RAILWAY COMPANY, and Chicago and Northwestern Railway Company, Appellees.**

No. 19151.

United States Court of Appeals Eighth Circuit.

May 6, 1969.

Rehearing Denied July 2, 1969.

Mehaffy, Circuit Judge, dissented.

Jon R. Duckstad, Asst. Corp. Counsel, City of St. Paul, Minn., for appellant; Joseph P. Summers, Corp. Counsel, City of St. Paul, Minn., on the briefs.

Philip Stringer, of Stringer, Donnelly & Sharood, St. Paul, Minn., for appellees; R. Paul Sharood, St. Paul, Minn., on the brief.

Before MATTHES, MEHAFFY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The City of St. Paul appeals from a judgment enjoining the enforcement of an amendatory zoning ordinance restricting building heights in a downtown river front area and adjudging the rezoning unconstitutional.

The rezoned area includes a city park which stretches more than three blocks along the edge of a sharp bluff overlooking the Mississippi River and Valley. The appellees' property lies from forty to ninety feet below the surface of the park at the foot of the bluff and is separated from the Mississippi River by railroad tracks and a waterfront street.[1]

The ordinance imposed height restrictions which effectively prohibit the erection of building on the appellees' property which would rise above the level of the park and the adjacent bluff.[2]

---

1. See Appendixes I, II and III.

2. In 1922, as part of a general zoning ordinance, the appellees' property was subject-
ed to a height restriction of one hundred feet. Property on top of the bluff was restricted to a height of one hundred and

The city park and the appellees' property lies largely between the Wabasha Street and Robert Street bridges which cross the Mississippi River and serve as the gateways to the downtown area from the south. The park was established in 1930 and serves to open up the southern approach to the core area which lies immediately to the north of the park.[3] It further serves as a passive recreational area for residents, shoppers, visitors and an estimated 23,000 to 25,000 downtown employees.

In the early 1960's the St. Paul Housing and Redevelopment Authority undertook planning for the renewal and redevelopment of the downtown core area with the cooperation of other public agencies and private interests. The plan was formally adopted in 1964. A similar task was undertaken by the City Planning Department as a part of an effort to develop a comprehensive plan for the entire city. The downtown portion of the comprehensive plan was adopted in March of 1963, and the plan as a whole in April 1963. Both the renewal plan and the comprehensive plan envisioned that the park would remain and that no structures would be built on the railroads' property which would rise above the level of the park.

The area immediately north of the zoned area has undergone the contemplated intensive redevelopment. The Hilton Hotel, Degree of Honor, Y.W.C.A. and Federal Courts buildings have been erected in the last few years. Block J has been cleared for the construction of a high rise apartment building. Further north in the core area, the Osborn, Northwestern National Bank and Farm Credit Bank buildings have been completed and more construction is contemplated.

At about the time that the public agencies began their planning, the railroads[4] started a program of disposing of its non-operating property throughout its system. The manager of the Real Estate Department of the railroad contacted a number of parties, beginning in the Spring of 1961, in an effort to stimulate interest in the subject property. He testified that publicity in the Fall of 1963, regarding the possible imposition of height restrictions on the property, dampened the sales effort. In late 1963, the railroads received an offer to purchase about one-half of the property, i. e., the land at the Wabasha Street end, for $4.00 per square foot. It was subject to the condition that the premises not be zoned so as to prohibit the construction of structures above the existing grade of the park. The management of the railroads rejected the offer on the basis that the property was needed for the railroad's operating purposes. At least two other potential purchasers of the property, who did not intend to build above the level of the park, indicated an interest but made no firm offers.

A consulting firm was engaged by the railroads in February, 1966, two months prior to trial, with a view toward a determination of the highest and best use of the property. The railroads' only interest was to sell the property. The

fifty feet. In 1929, the height restrictions were removed and the appellees' property has not been subject to restrictions until the present ordinance was enacted. There is no evidence indicating that either the city or the railroads considered high rise construction on appellees' property before the 1960's.

3. An appellee witness testified with respect to the considerations that went into the establishment of the park in the 1930's. "St. Paul was going to be progressive. We were going places and we did with a 29 million dollar bond issue: built a new court house [and streets to improve traffic on the north side of the Loop]. I can't give you the thinking of the men that made all the decisions in those days, but I would assume [that the park location was chosen] because of its scenic value, and the outlook over the river and the fact that it was just a delightful place to be."

4. The Chicago, St. Paul, Minneapolis and Omaha Railway Company is the owner in fee of the property. On December 31, 1956, under authority from the Interstate Commerce Commission, the property was leased to the Chicago and Northwestern Railway Company. For convenience, the appellees will be occasionally referred to as the "railroads."

study indicated that the highest and best use would be to construct a motel and four high rise apartments which would rise from ten to twenty-two stories above the park.[5] This use would give the apartment occupants the benefit of the light and view over the river valley but in so doing, would equally deprive others of these benefits. It would also result in the closing off the "front door" of the core area from the southern approaches. The study envisioned building on the property originally deemed necessary for operating purposes. A witness for the railroads testified that the problem had been resolved and the property was available.

Although the record is not clear, the city, in the Fall of 1963, apparently first became aware that the railroads were attempting to sell the river bottom property for the possible construction of buildings that would rise above the park level.

A number of municipal authorities and boards, including the Housing and Redevelopment Authority, the Planning Boards and the Zoning Board recommended the imposition of height restrictions. The action of the Planning Board was taken after a public hearing. The resolution passed by that Board recited that the rezoning was reasonably related to existing land uses, overall needs of the community and the planning for future land use.

On September 3, 1964, the City Council, after a public hearing at which the railroads were the sole voice in opposition, unanimously approved an ordinance restricting height in the questioned area and directed the corporation counsel to draft such an ordinance. The City Council formally adopted the ordinance on September 20, 1966.

In May of 1966, the appellees brought suit for a declaratory judgment and asked that the proposed ordinance be declared void and unconstitutional.[6] Following the formal enactment of the ordinance, the appellees filed a supplemental complaint and asked that the enforcement of the ordinance be enjoined or, in the alternative, money damages be awarded.

The District Court found that the fair value of the property prior to the passage of the ordinance was $320,000, and that its after value was $150,000. There is substantial evidence in the record to support this finding.

The court also found that the ordinance was unreasonable and arbitrary and, therefore, not a valid exercise of the police power because: (1) it bore no substantial relationship to health, safety, morals or the general welfare, and was enacted for aesthetic reasons only; (2)

5. The appellees' study demonstrating the highest and best use of the property calls for the construction of a motel and four apartment buildings containing 600 apartment units on 102,000 square feet. Under the St. Paul Zoning Code, Chapters 16 through 64, the appellees could not have constructed the 600 apartments without obtaining a variance. It requires 544,200 square feet of land. If the appellees devoted the entire 102,000 square feet to apartments, less than 125 units could be constructed under the Code provisions. The granting of a variance is discretionary and the decision to grant or deny one cannot be reversed in the absence of a clear abuse of that discretion. State v. Gunderson, 198 Minn. 51, 268 N.W. 850, 851 (1936).

6. The appellees (plaintiffs below) began this action by filing a complaint on May 20, 1966, praying for a declaratory judgment. At that time, the subject ordinance had not been formally adopted but the adoption of the ordinance in principle on September 3, 1964, had the effect of restraining the sale of the subject property. The District Court, on August 31, 1964, denied the appellant's (defendant below) motion to dismiss the action for failure to state a claim and lack of jurisdiction. The court held that while no jurisdiction existed to declare unconstitutional any ordinance which might impose height restrictions on the subject property in the future, the complaint presented an actual controversy with respect to the ordinance adopted in principle. The City Council, on September 20, 1966, formally adopted the ordinance we consider here and the appellees amended their complaint accordingly.

it was an instance of spot zoning and not part of a comprehensive plan; and (3) it was a confiscation without compensation in that the benefit to the public was small in comparison to the detriment of the property owner. The court concluded that the ordinance was "unconstitutional as violative of due process of law." It enjoined enforcement of the ordinance.

The court held that the appellees were not entitled to damages for enforcement of the ordinance during the pendency of the action as any damages during that period were minimal and speculative.

"Since it is clear that this was a good faith attempt by the city to exercise its police power and since there is no demonstration that there will be any further improper interference with the plaintiffs' property rights, the Court does not at this time award damages and thus, in effect, turn this action into an eminent domain proceeding."

It retained jurisdiction for the purpose of granting any further relief which might become necessary and proper under 28 U.S.C. § 2202. We reverse.

The appellees concede that the city's purpose is a public one. They acknowledge that the city can accomplish its objective by the proper exercise of its eminent domain power—compensating the railroads for the damage to their property. They argue, however, that the ordinance is violative of the Fifth Amendment to the United States Constitution and Article 1, Section 13 of the Minnesota Constitution in that it takes the railroads' property without compensation.[7]

■ Neither constitutional provision interposes a barrier to the imposition of restrictions on the use of private property if a zoning ordinance is enacted pursuant to a valid exercise of the police power. Goldblatt v. Town of Hempstead, 369 U.S. 590, 593, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962);[8] City of Marysville v. Standard Oil Co., 27 F.2d 478 (8th Cir. 1928), aff'd, Standard Oil Co. v. Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856 (1929); Kiges v. City of St. Paul, 240 Minn. 522, 62 N.W.2d 363, 369–370 (1953); State ex rel. Beery v. Houghton, 164 Minn. 146, 204 N.W. 569, 54 A.L.R. 1012 (1925), aff'd mem., 273 U.S. 671, 47 S.Ct. 474, 71 L.Ed. 832 (1927).[9] The test of whether the enact-

7. The Fifth Amendment to the United States Constitution provides in part: " * * * nor shall private property be taken for public use without just compensation." Article 1, Section 13 of the Minnesota Constitution provides: "Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."

The appellees argue that the Minnesota provision imposes a stricter standard than that under the federal provision. Because we believe that the ordinance does not violate the Minnesota Constitution as it has been interpreted by the Supreme Court of Minnesota, we express no opinion on whether a more stringent standard exists.

8. " ' * * * The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public is not—and, consistently with the existence and safety of organized society cannot be—burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community.' " Goldblatt v. Town of Hempstead, 369 U.S. 590, 593, 82 S.Ct. 987, 989 (1962).

9. "The public use, which sustains the taking of property under the power of eminent domain upon compensation paid, differs from the public interest or welfare which justifies the restriction of the individual in the use of his property without compensation, in consideration of the public interest and common welfare of the community. * * *
* * * * *
"Zoning statutes are becoming common. The police power in its nature indefinable, and quickly responsive, in the interest of common welfare, to changing conditions, authorizes various restrictions upon the use of private property as social and economic changes come. A restriction, which years ago would have been intolerable, and would have been

ment falls within that power is one of reasonableness.

The zoning ordinance will be sustained unless its " * * * provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). Gorieb v. Fox, 274 U.S. 603, 608–609, 47 S.Ct. 675, 71 L.Ed. 1228 (1927); McMahon v. City of Dubuque, Iowa, 255 F.2d 154, 158–159 (8th Cir.), cert. denied, 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958); Naegele Outdoor Adv. Co. v. Village of Minnetonka, 281 Minn. 492, 162 N.W.2d 206, 212 (1968); State ex rel. Howard v. Village of Roseville, 244 Minn. 343, 70 N.W.2d 404, 407 (1955).

In reviewing the trial court's determination of invalidity, we examine the record not to see whether its findings are supported by evidence but to ascertain upon the whole record whether it is possible to say that the legislative choice is without rational basis. South Carolina State H. Dept. v. Barnwell Bros., 303 U.S. 177, 191–192, 58 S.Ct. 510, 82 L.Ed.

734 (1938); Weinberg v. Northern Pac. Ry. Co., 150 F.2d 645, 648 (8th Cir. 1945).

Fairly debatable questions as to the reasonableness, wisdom and propriety of an ordinance are not for the determination of the courts but for that of the legislative body on which rests the duty and responsibility of the decision. Standard Oil Co. v. Marysville, *supra*; Naegele Outdoor Adv. Co. v. Village of Minnetonka, 162 N.W.2d at 209.

The mere fact that the ordinance seriously depreciates the value of the complainants' property is not enough to establish its invalidity. Goldblatt v. Town of Hempstead, *supra* at 594, 82 S.Ct. at 990,[10] American Wood Products Co. v. City of Minneapolis, 21 F.2d 440, 444 (D.Minn.1927) (J. Sanborn), aff'd, 35 F.2d 657 (8th Cir. 1929); Kiges v. City of St. Paul, 62 N.W.2d at 369. Nor can it be invalidated on the grounds that aesthetic considerations will be furthered if it is permitted to stand. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954);[11] Naegele Outdoor Adv. Co. v. Village of Minnetonka, *supra*;[12] State ex rel. Twin City Bldg. &

thought an unconstitutional restriction of the owner's use of his property, is accepted now without a thought that it invades a private right. As social relations become more complex, restrictions on individual rights become more common."
State ex rel. Beery v. Houghton, 164 Minn. 146, 204 N.W. 569, 569–570 (1925), aff'd mem., 273 U.S. 671, 47 S.Ct. 474 (1927).

10. "This is not to say, however, that governmental action in the form of regulation cannot be so onerous as to constitute a taking which constitutionally requires compensation. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 * * *. There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant, see Pennsylvania Coal Co. v. Mahon, supra, it is by no means conclusive, see Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 * * *, where a diminution of value from $800,000 to $60,000 was upheld. * * *."

Goldblatt v. Town of Hempstead, *supra*, at 594, 82 S.Ct. at 990.

11. " * * * The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."
Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 103 (1954).

12. " * * * The mere fact that the adoption of a zoning ordinance reflects a desire to achieve aesthetic ends should not invalidate an otherwise valid ordinance.

Inv. Co. v. Houghton, 144 Minn. 1, 174 N.W. 885, 176 N.W. 159, 162, 8 A.L.R. 585 (1920).[13]

An examination of the entire record in the light of the above standards convinces us that the trial court erred in substituting its judgment for that of the City Council.[14] In so holding, we note that the city's answers to the railroads' interrogatories were vague, conclusionary, unresponsive and not in accordance with Rule 33, Federal Rules of Civil Procedure. If these answers reflected accurately the sum of the Council's reasons for enacting the ordinance, we would have no alternative but to hold that they were inadequate.[15] The record indicates, however, that the Council's action was preceded by studies and recommendations of other municipal agencies; and, that reports of these studies were communicated to the Council. It also shows that the Council conducted a public hearing before passing the ordinance. From a reading of the record, it is fair to say that as a result of the reports and recommendations it received from the public agencies, the Council had before it most of the evidence developed at trial before the District Court including the following:

(1) The passage of the ordinance was preceded by studies and favorable recommendations of the Housing and Redevelopment Authority, the Planning Board (after a public hearing) and the Zoning Board. These recommendations were communicated to the City Council. American Wood Products Co. v. City of Minneapolis, *supra* at 444. See, Ostrand v. Village of North St. Paul, 275 Minn. 440, 147 N.W.2d 571, 573 (1967).

(2) The City Council held a public hearing prior to the adoption of the ordinance. The Housing and Redevelopment Authority, the Planning Board, the Metropolitan Improvement Committee, the Y.W.C.A., the St. Paul Automobile Club and the Downtown Department of the Chamber of Commerce appeared at the hearing and submitted their views as to why the ordinance should be adopted.

(3) Mr. B. Warner Shippee, the former director of the Housing and Rede-

---

Thus, if the challenged restriction is reasonably related to promoting the general welfare of the community or any other legitimate police power objective, the fact that aesthetic considerations were a significant factor in motivating its adoption cannot justify holding it unconstitutional. * * *." (Citations omitted.)
Naegele Outdoor Adv. Co. v. Village of Minnetonka, 281 Minn. 492, 162 N.W.2d 206, 212 (1968).

13. " * * * It is time that courts recognize the aesthetic as a factor in life. Beauty and fitness enhance values in public and private structures."
State ex rel. Twin City Bldg. & Inv. Co. v. Houghton, 144 Minn. 1, 176 N.W. 159, 162 (1920).

14. The trial court found that the traffic and fire protection problems which could be created by the construction of high rise buildings on appellees' property were not unreasonable and were an insufficient basis on which to sustain the ordinance. We place primary reliance on other factors in sustaining the ordinance.

15. "Interrogatory number 9: 'How and in what manner and to what extent does Ordinance No. 13346 promote public health.' Answer: 'Unable to answer specifically.'
"Interrogatory number 10: 'How and in what manner and to what extent does Ordinance No. 13346 promote public safety.' Answer: 'Unable to answer specifically.'
"Interrogatory number 11: 'How, in what manner and to what extent does Ordinance number 13346 promote public order.' Answer: 'Unable to answer specifically.'
"Interrogatory number 12: 'How, in what manner, and to what extent does Ordinance No. 13346 promote public convenience.' Answer: 'Unable to answer specifically.'
"Interrogatory number 13: 'How, in what manner and to what extent does Ordinance No. 13346 promote public prosperity.' Answer: 'Unable to answer specifically.'
"Interrogatory number 14: 'How, in what manner and to what extent does Ordinance No. 13346 promote general welfare.' Answer: 'Promotes the general welfare in a general way.' "

velopment Authority, testified at trial that the downtown renewal project had three objectives:

"First, the economic improvement of the city and the central business district. Secondly, its physical improvement; and thirdly, in the course of doing this the removal of blight, deleterious structures and influences of economic disuse in the area."

Mr. Shippee further testified that when the Authority undertook the renewal project, it acted on the assumption "that the area in front of the mall would be kept clear of obstructions—that. [the] park would remain and provide sort of a front door for the Capitol Center downtown project as well as generally the central business district." He added that the subject area was directly related to the renewal project and that the Authority felt that high rise construction could have an adverse affect on property values and the renewal project.

"* * * The Authority actually took cognizance of this problem in a meeting of June 11, 1964, * * *. * * * [T]he authority commissioners after discussing the matter moved unanimously that it was their opinion that the ordinance [restricting height] was feasible and in the best interest of the community. The discussion had related to the relationship of the ordinance to the Capitol Center Downtown Renewal project. * * *."

(4) Dr. Noland Heiden, City Planner for the City of St. Paul, quoted from the comprehensive city plan as follows:

" 'A sixth land use area of the central business district can be called the "south Kellogg" area and will remain largely as it now exists. It is composed of the blocks along the edge of the river bluff south of Kellogg Boulevard and presently contains industrial

office operations * * *. The major proposal is to extend the Kellogg Mall one block up to the east to the post office. This would more fully open up the "front porch" of the central business district and provide necessary land for street improvements designed to facilitate access to the central business district from Warner Road.' "

(5) Appellees' witnesses conceded that the property values on the north side of Kellogg Boulevard would be diminished by the erection of high rise building on the appellees' property which would partially obstruct the view of the river valley.[16] See, State ex rel. Saveland Park Holding Corp. v. Wieland, 269 Wis. 262, 69 N.W.2d 217, 222, cert. denied, 350 U.S. 841, 76 S.Ct. 81, 100 L.Ed. 750 (1955).

No evidence was offered at trial to show: that the ordinance was designed to restrict competition, compare, Pearce v. Village of Edina, 263 Minn. 553, 118 N.W.2d 659, 671, n. 1 (1962); or that the railroads acquired the property with the expectation that it would be used in the manner they now seek, compare, Alexander v. City of Minneapolis, 267 Minn. 155, 125 N.W.2d 583, 585 (1963); or that the railroads cannot continue to use their property as they have in the past.

In our view, the appellees' reliance on Ostrand v. Village of North St. Paul, supra; Alexander v. City of Minneapolis, supra; Pearce v. Village of Edina, supra; and Olsen v. City of Minneapolis, 263 Minn. 1, 115 N.W.2d 734 (1962), is misplaced. While there is language in each opinion supporting the appellees' position—that an amendatory zoning ordinance designed to protect aesthetic values and resulting in the diminution of the market values of the complainants' property is invalid—that language must be viewed in the light of the facts in

16. Mr. Rohland H. Thomssen, Executive Vice President of the Clapp-Thomssen Company of St. Paul, a leading real estate firm in the city, and Mr. Stanley Miller, Vice President of the Real Estate Research Corporation, a real estate con-

sulting firm employed by the railroads, testified that the value of properties on the north side of Kellogg Boulevard would be diminished by high rise construction on appellees' property.

those cases. Those factual situations were significantly different from the one presented here. We would add that in those four cases, as in those where a contrary result was reached, the Minnesota Court made it clear that the test is one of reasonableness.

We are convinced that were this case presented to the Minnesota Supreme Court, it would hold that the determination of the City Council—that the ordinance was reasonably related to the protection of public welfare—would be permitted to stand. In our view, the action of the City Council was based "on reason and logic and not on whim and caprice." It promoted a legitimate police power objective—the renewal of the core area of Downtown St. Paul so as to be a desirable place in which to work, shop, live and enjoy cultural and recreational activities. The benefit to the public in preserving these values was great in comparison to the diminution in market values suffered by the appellees.

Reversed.

MEHAFFY, Circuit Judge (dissenting).

I respectfully dissent primarily because the opinion of the majority condones a discriminatory taking of valuable property rights without compensation in plain derogation of the Fifth Amendment to the federal Constitution as well as the broader provisions of the Constitution of the State of Minnesota. Subsidiarily, yet importantly, I am of the view that the majority opinion falls in error by ignoring the findings of fact of the trial court, thus setting up this reviewing court as a trier of facts, a function never condoned by the Supreme Court, this Court, or any other court of which I have knowledge.

The majority opinion is erroneously based first on the mistaken assumption that there is no "taking" of appellees' property, and hence no violation of the mandate of the Fifth Amendment that " * * * nor shall private property be taken for public use, without just com-

pensation," and Article 1, § 13 of the Minnesota Constitution which provides that "private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." The Supreme Court has long and consistently held that governmental restrictions can so diminish the value of property as to constitute a taking. In United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958), the Court said:

> "Traditionally, we have treated the issue as to whether a particular governmental restriction amounted to a constitutional taking as being a question properly turning upon the particular circumstances of each case. * * * *In doing so, we have recognized that action in the form of regulation can so diminish the value of property as to constitute a taking.* (Emphasis supplied.) "

It is not arguable but that a taking is effected in this case by the restrictive ordinance. The railroad undeniably incurred substantial damage to its property by reason of this amendatory, height-restricting ordinance, which in some places forbids the railroad from even building to within seventeen feet of the ground level of the park property. The majority opinion admits there is substantial evidence supporting the court's finding respecting the damage. The Minnesota Supreme Court in Burger v. City of St. Paul, 241 Minn. 285, 64 N.W.2d 73 (1954), held that a "taking" included every interference with the ownership, possession and enjoyment of value of private property. The court there said at 64 N.W.2d 77:

> "It is settled law in Minnesota that easements, whether in the nature of a right-of-way, a restrictive covenant, or a negative or equitable easement, are property within the meaning of the Minnesota Constitution and cannot be taken without compensation or be removed by mere zoning under the police power."

Following this quotation, the Minnesota court quotes the applicable state constitutional provision appearing elsewhere in this opinion and also cites several Minnesota cases as well as United States v. Wheeler Township, 66 F.2d 977 (8th Cir. 1933).

Alexander v. City of Minneapolis, 267 Minn. 155, 125 N.W.2d 583 (1963), is a case strikingly similar to the one here. There, because of the city's plan to impose a height restriction on proposed construction, it refused to issue a building permit for an apartment building for the reason that the proposed plan would cause the property owner to suffer a substantial diminution in the value of his property without compensation being paid. The Minnesota court stated at 125 N.W.2d 586, 587:

"We have recently stated that the enactment of 'spot' zoning ordinances or amendments to comprehensive zoning ordinances under the police power which results in a total destruction or substantial diminution of value of property affected thereby without just compensation therefor constitutes the taking of property without due process. Olsen v. City of Minneapolis, 263 Minn. 1, 115 N.W.2d 734; Pearce v. Village of Edina, 263 Minn. 553, 118 N.W.2d 659. See, also, Golden v. City of St. Louis Park, 266 Minn. 46, 122 N.W.2d 570; Connor v. Township of Chanhassen, 249 Minn. 205, 81 N.W.2d 789. Where the motivating basis for such enactments is in furtherance of the esthetic concepts of nearby property owners who are not called upon to make compensation to the owner for any resulting loss or diminution in the value of his property, this would be particularly true."

Additionally, the Minnesota court in *Alexander* quoted the cogent and appropriate language of Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–416, 43 S.Ct. 158, 67 L.Ed. 322 (1922), as follows:

" ' * * * The protection of private property in the Fifth Amendment * * * provides that it shall not be taken for such [public] use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. [Citing cases.] When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

" 'The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * In general it is not plain that a man's misfortunes or necessities will justify his shifting the damages to his neighbor's shoulders. [Citing cases.] We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.' "

The majority quotes in footnote 11 from Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 103, 99 L.Ed. 27 (1954), Mr. Justice Douglas' statement: " * * * If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way." However, the majority failed to quote Mr. Justice Douglas' statement in the same opinion on page 36, 75 S.Ct. on page 104: "The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking."

In the *Berman* case, the Court held that statutes delegating to redevelopment agencies the power of eminent domain are not invalid and that the rights of property owners are protected where they are compensated for the taking of their property. With this ap-

proach, *i. e.*, condemnation, I have no quarrel. Neither do appellees nor the Minnesota Supreme Court, which made its position on this question abundantly clear in Golden v. City of St. Louis Park, 266 Minn. 46, 122 N.W.2d 570, 577 (1963), where it said:

"While there should be no objection to a municipality's endeavors to apply esthetic considerations to plans for future development, in doing so it should be aware that where such plans involve destruction or diminution of property rights or interests, just compensation therefor should be paid to the owners whose rights or interests are thus taken for the benefit of the community as a whole."

Supportive to its statement that neither constitutional provision interposes a barrier to the imposition of the restrictions imposed here, the majority cites and relies upon Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 98, 78 L.Ed.2d 130 (1962); City of Marysville v. Standard Oil Co., 27 F.2d 478 (8th Cir. 1928); aff'd Standard Oil Co. v. Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856 (1929); Kiges v. City of St. Paul, 240 Minn. 522, 62 N.W.2d 363 (1953); State ex rel Beery v. Houghton, 164 Minn. 146, 204 N.W. 569 (1925), aff'd Mem. 273 U.S. 671, 47 S.Ct. 274, 71 L.Ed. 832 (1927).

The cases cited and relied upon to avoid the constitutional requirement of payment of just compensation are patently inapposite to the facts and the issues in the instant case. *Goldblatt, supra,* involves an ordinance regulating mining within the corporate limits of a town. Specifically, the ordinance provided that "no excavation shall be made below two feet above the maximum ground water level at the site." 369 U.S. at 591, 82 S.Ct. at 988 n. 1. The contention of one of appellants was that the ordinance would prevent it from continuing in business and thus was the taking of property without due process of law in violation of the Fourteenth Amendment. The property owner (Goldblatt) owned a 38-acre tract within

the town limits upon which one of the other appellants was engaged in mining sand and gravel. In describing the situation there, the Court said:

"Before the end of the first year [after mining operations commenced in 1927] the excavation had reached the water table leaving a water-filled crater which had been widened and deepened to a point that it is now a 20-acre lake with an average depth of 25 feet. The town has expanded around this excavation, and today within a radius of 3,500 feet there are more than 2,200 homes and four public schools with a combined enrollment of 4,500 pupils." 369 U.S. at 591, 82 S.Ct. at 988.

The Supreme Court noted that "the ordinance in question was passed as a safety measure, and the town is attempting to uphold it on that basis." 369 U.S. at 595, 82 S.Ct. at 990. The Court noted also a dearth of relevant evidence upon which it could evaluate the reasonableness of the ordinance and, *inter alia,* the loss which appellants would suffer from the imposition of the regulation. Significant is the following language of Mr. Justice Clark at 369 U.S. at 594, 82 S.Ct. at 990:

"How far regulation may go before it becomes a taking we need not now decide, for there is no evidence in the present record which even remotely suggests that prohibition of further mining will reduce the value of the lot in question."

Thus, *Goldblatt, supra,* specifically did not reach the issue which is crucial here.

The next case cited and relied on by the majority is also clearly distinguishable. It is City of Marysville v. Standard Oil Co., *supra,* and, like *Goldblatt,* involved a safety ordinance as distinguished from the usual zoning ordinance. The ordinance required all tanks within the city limits used for storage of petroleum products or other inflammable liquids to be buried at least three feet underground. Tanks of a capacity

of 500 gallons or less, if used for the storage of crude oil, distillate or fuel oil, and less than ten gallons, if used for the storage of gasoline, kerosene or naphtha, were exempt from the requirement. The petitioners, dealers in petroleum products who were licensed under a former ordinance, had maintained for many years two tanks for the storage of gasoline and kerosene of approximately 12,000 gallons capacity, each within the city limits. Petitioners contended that the ordinance was so arbitrary and capricious as applied to them as to constitute a deprivation of their property without due process of law. In upholding the ordinance, the Supreme Court noted that the master found that gasoline and kerosene stored in large quantities are dangerous, inflammable substances, which when ignited are a menace to life and property in the vicinity; that even with the use of most modern safety devices, fires or explosions of such storage tanks occur, and that within the four years preceding the trial five disastrous fires of gasoline storage stations had occurred in Kansas, in two of which gasoline tanks had exploded, in one case striking and burning a building 475 feet away, killing nine people, wounding 26 more, and burning several houses. Additionally, the findings show that within an even smaller radius from petitioners' tanks and in the same or adjacent blocks, there are many buildings including residences, a hotel, warehouses and garages, some of wooden structure, and kerosene storage tanks of 75,000 gallons capacity, and that the principal street of the town is within two blocks of the Standard tank. The Court further observed that the ordinance does not preclude petitioners from locating their storage tanks without the city limits and hence the burden imposed upon them cannot be greater or otherwise more objectionable than that imposed by the forced removal of dangerous or offensive trades or businesses.

It is one thing to ordain for the safety of residents of a city but quite another to single out and take a person's property for esthetic purposes without compliance with the constitutional provisions for just compensation.

The two Minnesota cases relied upon by the majority are not in point and hardly justify a passing word, in light of the more recent cases of the Minnesota court which are in point and which I think are controlling here.

The first of these two cases cited by the majority is Kiges v. City of St. Paul, *supra,* where the court merely held that in a case tried to the court without a jury, when the trial court had found that an amendatory ordinance was within the scope of the city's comprehensive plan, such findings will not be reversed on appeal unless they are "manifestly contrary to the evidence. * * * " The majority in the instant case ignores the findings of the trial court, so it is difficult to comprehend how *Kiges, supra,* is relevant to its conclusion.

The final case cited by the majority on this crucial issue is State ex rel. Beery v. Houghton, *supra.* This was a mandamus suit seeking a permit for a four-family flat prohibited by a comprehensive zoning ordinance, and the Minnesota court held that a fair zoning ordinance resulting in the exclusion of a four-family flat building from a designated residential district is constitutional.

It appears obvious to the writer that the cases relied upon by the majority form too fragile a base to justify a skirting of the constitutional provisions which protect a landowner from a confiscatory taking of substantial property rights without compensation. Moreover, it is singular to note that the majority completely ignores the deliberate and obviously discriminatory "spot" zoning in the instant case, and beyond that the majority opinion is based on a concept that would only be applicable if constitutional validity is first determined.

The specific premise of the majority opinion rests upon a patently erroneous basis in that it completely overlooks the requirement of constitutionality in its

approach to this case. The majority states: "In reviewing the trial court's determination of invalidity, we examine the record not to see whether its findings are supported by evidence but to ascertain upon the whole record whether it is possible to say that the legislative choice is without rational basis," and "fairly debatable questions as to reasonableness, wisdom and propriety of an ordinance are not for the determination of the courts but for that of the legislative body on which rests the duty and responsibility of the decision." There can be no quarrel with the majority's abstract statements, but the premise is valid only if based upon the assumption of absence of constitutional infirmity. It cannot be questioned that under the principle of separation of powers the courts cannot invade the jurisdiction of other departments of government, but it is equally elementary that a city, state, or even the Congress, cannot validly invoke any ordinance or statute regardless of its "reasonableness, wisdom and propriety" if such ordinance or statute violates fundamental provisions of the Constitution. We are dealing here with the power of a municipality—the validity of an amendatory ordinance—not with the rational basis of the ordinance.

The cases relied on for the formation of the erroneous premise upon which the majority opinion rests are inapposite, as will be revealed by close reading of the opinions—and the Supreme Court, this court and every other court of which I have any knowledge support the principle I suggest—that before a city, the state or the national Congress can validly make a choice, whether under the police power or not, the choice must first be constitutionally valid.

It seems so elementary as to be unnecessary to cite cases to the effect that the doctrine advanced by the majority cannot be invoked if specific constitutional prohibitions are violated. For example, the Supreme Court said in Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 215, 82 S.Ct. 1318, 1339, 8 L.Ed.2d 462 (1962):

"In dealing with problems of interpretation and application of federal statutes, we have no power to change deliberate choices of legislative policy that Congress has made *within its constitutional powers.* (Emphasis supplied.)"

The Supreme Court also said in Polish Nat. Alliance of United States of North America v. National Labor Relations Board, 322 U.S. 643, 650, 64 S.Ct. 1196, 1200, 88 L.Ed. 1509 (1944):

"On the other hand, the old admonition never becomes stale, that this Court is concerned with the bounds of legal power and not with the bounds of wisdom in its exercise by Congress."

This court said in Review Committee, Venue VII, etc. v. Willey, 275 F.2d 264, 271 (8th Cir. 1960):

"And '*once the question of constitutional power is answered in the affirmative* the wisdom, need and effectiveness of a particular statute enacted in the exercise of that power is a question for the Congress not the courts.' United States v. Kissinger, supra, at page 942 of 250 F.2d [940], Wickard v. Filburn, supra, page 129 of 317 U.S. [111], at page 91 of 63 S.Ct. [82], 87 L.Ed. 122 (Emphasis supplied.)"

See also and compare Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966); Wolf v. Selective Service Local Bd. No. 16, 372 F.2d 817 (2nd Cir. 1967); Hurley v. Reed, 110 U.S.App. D.C. 32, 288 F.2d 844 (1961).

The majority takes as its text extracts from the opinion in South Carolina State Highway Dept. v. Barnwell Bros., Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938), but this is an altogether different question from the one presented here. *Barnwell* dealt with a South Carolina statute concerning the weight and width regulations of trucks on its highways so as to conserve the highways and promote safety thereon. The Supreme Court there held that the adoption of the methods used by South Carolina was a

legislative and not a judicial choice, but what the majority here overlooks is that the Supreme Court in *Barnwell* was discussing a state statute that did not infringe the Constitution or any national legislation relating to interstate commerce and was not discriminatory. The Supreme Court noted at 303 U.S. 181, 58 S.Ct. 510, 512 at the outset of its opinion that the district court of three judges had ruled that the provisions of the South Carolina statute had not been superseded by the Federal Motor Carrier Act, and "do not violate the Fourteenth Amendment." The Supreme Court also said in *Barnwell,* "when the action of a legislature is within *the scope of its power*, fairly debatable questions as to its reasonableness, wisdom and propriety are not for determination of the courts, but for the legislative body on which rests the duty and responsibility of decision. (Emphasis supplied.)" 303 U.S. at 190–191, 58 S.Ct. at 517. The Court then continues its discussion based on the constitutionality of the statute. Finally, in its conclusional paragraph, the Supreme Court in *Barnwell* said:

> "The legislative measures taken by South Carolina are within its legislative power. *They do not infringe the Fourteenth Amendment,* and the re-

sulting burden on interstate commerce is not forbidden. (Emphasis supplied.)" [1]

The other case cited in the majority opinion in support of its premise is Weinberg v. Northern Pac. Ry. Co., 150 F.2d 645 (8th Cir. 1945), where an extract from *Barnwell* was quoted relating to the examination of the whole record to ascertain whether it is possible to say that the legislative choice is without rational basis, but preceding that statement we note that the court said at page 648:

> "It is generally held that if the action of a legislative body is *within the scope of its power*, questions as to the reasonableness, wisdom and propriety of its action, if fairly debatable, are not for the determination of courts, but for the legislative body. (Citing cases.) (Emphasis supplied.)"

It is significant to note also that in *Weinberg* this court found that the findings of the trial judge were sustained by the evidence and affirmed the court's order permanently enjoining the city from the enforcement of its ordinance with respect to the appellee railway company. 150 F.2d at 652. There

---

1. Considering a similar question in Bibb v. Navajo Freight Lines, 359 U.S. 520, 523–524, 79 S.Ct. 962, 964, 3 L.Ed.2d 1003 (1959), the Court cited the *Barnwell* case and there said:
"*The power of the State to regulate the use of its highways is broad and pervasive.* We have recognized the peculiarly local nature of *this subject of safety*, and have upheld state statutes applicable alike to interstate and intrastate commerce, despite the fact that they may have an impact on interstate commerce. South Carolina Highway Dept. v. Barnwell Bros., 303 U.S. 177 [58 S.Ct. 510]; Maurer v. Hamilton, 309 U.S. 598 [60 S.Ct. 726, 84 L.Ed. 969]; Sproles v. Binford, 286 U.S. 374 [52 S.Ct. 581, 76 L.Ed. 1167]. The regulation of highways 'is akin to quarantine measures, game laws, and like local regulations of rivers, harbors, piers, and docks, with respect to which the state has exceptional scope for the exercise of its regulatory power, and which,

Congress not acting, have been sustained even though they materially interfere with interstate commerce.' Southern Pacific Co. v. Arizona, 325 U.S. 761, 783] 65 S.Ct. 1515, 89 L.Ed. 1915].
"*These safety measures* carry a strong presumption of validity when challenged in court. If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective. Policy decisions are for the state legislature, absent federal entry into the field. Unless we can conclude on the whole record that 'the total effect of the law *as a safety measure* in reducing accidents and casualties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it' (Southern Pacific Co. v. Arizona, *supra*, pp. 775–776 [65 S.Ct. 1515], we must uphold the statute. (Emphasis supplied.)"

the court noted that "an ordinance even though not invalid in its entirety may, nevertheless, in operation be found, under existing facts, to be arbitrary and unreasonable, and to that extent may be declared to be inoperative. (Citing cases.)" 150 F.2d at 648.

*Spot Zoning.* As background material, perhaps it will be helpful to recite some of the undisputed facts leading up to this litigation. For many years, the appellee-owner of the property here involved, Chicago, St. Paul, Minneapolis and Omaha Railway Company (Northwestern Railway Company is lessee), maintained a freight house on the property but the same was retired and the building taken down in 1957. By 1960, said appellee was engaged in a program of disposing of its property that was not required for its operating purposes. In that same year, the subject property was brought to the attention of the real estate department of the appellee-owner as being a non-paying facility. After the usual preliminary work embracing title investigation, etc., appellee instituted an active campaign to sell the subject property. In connection with this campaign, appellee contacted some forty to fifty prospective purchasers. The subject property at the time was zoned for industrial usage and, of course, there was no restriction upon it.

At the time it commenced its campaign to dispose of this property, there was no such thing as the St. Paul Downtown Redevelopment Plan in existence, and when such a plan was adopted it did not embrace the subject property. Mr. B. Warner Shippee, the then executive director of the St. Paul Housing and Redevelopment Authority, testified relating to the downtown project as follows:

"Q. Then, could I ask you specifically what, if any, urban planning or development objectives did the Housing Authority have toward the property that's the dispute of this lawsuit; that is, the railroad property below the bluff, Kellogg Mall bluff between Robert Street and Wabasha?

"A. Well, first I have to indicate that this property is not within the urban redevelopment or renewal area of the downtown project, which is a twelve block area."

Mr. Shippee also testified that "the Housing Authority is generally responsible for the housing programs and urban renewal programs in connection with the entire city of St. Paul; and has had both actively going on a series of renewal projects and has contemplated or had been planning a series of additional projects both in and out of the core area." The witness in discussing objections to construction of buildings which would extend into the area above Kellogg Boulevard said that this subject did not come to the attention of the Authority's commissioners until 1964. He testified:

"The Authority actually took cognizance of this problem in a meeting of June 11, 1964, when the proposed ordinance which has been referred to was brought to their attention by me as executive director."

The Council of the City met on September 3, 1964 and adopted a motion instructing its attorney to prepare an ordinance amending the zoning code to establish height restrictions, but such an ordinance was not adopted until September 20, 1966. This was only after the instant suit had been instituted on May 20, 1966 and after Judge Larson had on August 31, 1966 denied the city's motion to dismiss the appellees' complaint. The publicity, however, of the earlier council meeting sufficed to chill the interest of any prospective purchaser in the subject property, and it seems apparent that appellees would have been left in this stymied position indefinitely had this suit not been brought.

Actually, this subject was brought to the attention of the city by the appellee-owner's campaign to sell its property, and at least one of the city committees had had a so-called public meeting prior to the one mentioned above, but appellee was given no notice of it and, therefore, was not represented. The first knowl-

edge of the city's threat to impose a height restriction on the subject property was brought to the attention of appellees in 1963.

The amendatory ordinance is directed solely at the subject property and is a classical example of illegal "spot" zoning. The ordinance affects no other property and there have been and are being constructed buildings of great height on all other sides of the park. Property within 100 feet of the subject property was recently condemned by the Housing Authority as "blighted," the owner was paid compensation therefor, and it was sold to private interests as a site for a high rise luxury apartment building. Housing and Redevelopment Authority of the City of St. Paul v. Coleman's Service, Inc., 281 Minn. 63, 160 N.W.2d 266 (1968). At the time of this condemnation proceeding, the property there involved was used as a parking lot which is the use to which a portion of the subject property is now being put.

The Minnesota court has repeatedly held that the enactment of "spot" zoning ordinances or amendments to comprehensive zoning ordinances under the police power, which results in a total destruction or substantial diminution of value of property affected thereby without just compensation therefor, constitutes a taking of property without due process. Alexander v. City of Minneapolis, supra; Pearce v. Village of Edina, 263 Minn. 553, 118 N.W.2d 659, 671 (1962), and cases therein cited. In Golden v. City of St. Louis Park, supra, the Minnesota Supreme Court said (122 N.W.2d at page 577):

> "Likewise, it should consider evidence relative to authorized uses and classifications of property adjacent to that involved in the proceedings, and where it finds from the evidence that restrictions imposed upon the property involved have not been made applicable to adjacent or nearby tracts within the same zoning classifications, it should not hesitate to determine that the restrictions applied to the property involved are violative of fundamental,

constitutional property rights of its owner. Rowland v. City of Racine, 223 Wis. 488, 271 N.W. 36; City of Pleasant Ridge v. Cooper, 267 Mich. 603, 255 N.W. 371."

For further references concerning spot zoning, see annotation in 51 A.L.R. 2d 263, 311 and 58 Am.Jur., Zoning § 39.

*Findings of Fact.* There are many factual resolutions required for a determination of this case such as: the scope of the ordinance; its purpose; its effect on the property involved; its relation to the adjoining property and many more. Only a fact finding tribunal can make such determinations.

Fed.R.Civ.P. 52(a) provides that "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We applied the "clearly erroneous" rule in the zoning case of McMahon v. City of Dubuque, Iowa, 255 F.2d 154, 159 (8th Cir. 1958), cert. denied, 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed. 2d 70 (1958), where we affirmed the action of the district court upholding the ordinance and there stated: "The findings of the District Court are presumptively correct and the evidence presented on this appeal does not show that they are clearly erroneous." We cited *McMahon* with approval in Barryhill v. United States, 300 F.2d 690, 693 (8th Cir. 1962).

More recently, this court, speaking through Judge Van Oosterhout, now Chief Judge, in Whitson v. Yaffe Iron & Metal Corp., 385 F.2d 168, 169 (8th Cir. 1967), said:

> "The clearly erroneous standard applies to appellate review of findings of fact by the trial court in cases tried to the court without a jury. Rule 52 (a) Fed.R.Civ.P.; Friedman v. Fordyce Concrete, Inc., 8 Cir., 362 F.2d 386, 387; Nelson v. Seaboard Sur. Co., 8 Cir., 269 F.2d 882, 886.

> "We do not try cases de novo upon appeal. With respect to credibility findings, great weight must be given

to the fact that the trial court had an opportunity to observe and hear the witnesses. A finding is clearly erroneous only if it is induced by an erroneous view of the law or if substantial evidentiary support is lacking."

Other Eighth Circuit cases to the same effect include First National Bank of Clinton v. Julian, 383 F.2d 329, 333 (8th Cir. 1967); Commissioner of Internal Revenue v. Riss, 374 F.2d 161, 166 (8th Cir. 1967); Coca-Cola Co. v. C.I.R., 369 F.2d 913, 919 (8th Cir. 1966); Hamm v. C.I.R., 325 F.2d 934, 937 (8th Cir. 1963), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1963).

Cases of this type must be considered upon each set of particular facts and the trial court here of necessity made numerous findings of fact which I do not think we are at liberty to ignore in this case under the rule and concept of ascertaining from the whole record whether it is possible to say that the legislative choice is without rational basis. If we have such authority in the instant case, we are permitted to bypass fundamental constitutional rights, and, furthermore, with this precedent, we certainly would feel privileged to exercise such a rule in many other cases in the future. This would be in disregard of Rule 52(a), and there would be no end to the employment of such a rule even in situations like we have here that would bring about a circumvention of basic constitutional rights.

Here, it was the trial court's duty to weigh the evidence, determine its credibility and ascertain whether the evidence was supportive of establishing that factors relative to health, safety and public welfare bore a material relationship to the restrictive provisions of the ordinance. Pearce v. Village of Edina, *supra.* Beyond that in the instant case it was the trial court's duty to consider the evidence relating to adjacent property, and the effect, if any, of the ordinance on other and adjacent property with respect to the "spot" zoning issue.

*Standard for Review on Doubtful Questions of State Law.* While this writer has never been particularly enchanted by it, there nevertheless exists a deeply embedded rule in this circuit to the effect that our standard for review on a doubtful question of state law is to ascertain only whether the trial court has reached a permissible conclusion, and, if so, we will not interfere with it. General American Life Ins. Co. v. Yarbrough, 360 F.2d 562, 568 (8th Cir. 1966); Solomon v. Northwestern State Bank, 327 F.2d 720, 723 (8th Cir. 1964); Campbell v. Village of Silver Bay, Minn., 315 F.2d 568, 575 (8th Cir. 1963); St. Paul Hospital & Cas. Co. v. Helsby, 304 F.2d 758, 759 (8th Cir. 1962).

I do not think a doubtful question of state law exists here. The opinions of the Minnesota Supreme Court we have cited seem to clearly support the trial court's conclusion. Judge Larson, while not reaching the heart of this case, wrote an extensive memorandum denying the city's motion to dismiss, citing the Minnesota cases of Pearce v. Village of Edina, *supra*; and Alexander v. City of Minneapolis, *supra.* Judge Lord, who heard this case, served as Attorney General of the State of Minnesota, and was experienced in eminent domain proceedings. *See, e. g.,* State by Lord v. Casey, 263 Minn. 47, 115 N.W.2d 749 (1962).

The majority speculates that the Supreme Court of Minnesota would hold as the majority has held, but I do not agree. I think that this case can and should be determined without reaching a federal question, and it is inconceivable to me that the Minnesota court would permit a confiscation of property rights without just compensation. This is particularly so because of the broad provisions of the Minnesota Constitution and its interpretation thereof.

It alarms me that this court would go further in the direction of condoning an arbitrary and unreasonable taking of private property without just compensation than either the United States Supreme Court or the Minnesota Supreme

Court. I would affirm the judgment of the district court. Noting that this suit was brought in the alternative, and that the district court has retained jurisdiction, said court, if the city prefers, could treat the case as one of eminent domain, and if in the trial court's opinion the ends of justice required it, the court could permit the parties to adduce additional evidence on the damage issue.

## APPENDIX I

Plaintiff's Exhibit 1.

## MAP A
## DOWNTOWN
## ST. PAUL AREA
APPENDIX II

| | |
|---|---|
| ⬚ REZONED AREA | |
| - - - CORE AREA | |
| ▨ SUBJECT PROPERTY | |

0    500'   1000'   1500'

REAL ESTATE RESEARCH CORPORATION

APPENDIX III

MAP B
LOCATION MAP

○ RENEWAL AREA BLOCKS
▨ SUBJECT PROPERTY

Park area has been delineated by this court along with indicating the location of some of the recent construction.

REAL ESTATE RESEARCH CORPORATION

CORE AREA

3-66-156 Civi

PLAINTIFFS
EX. 19
O. C. BREVIU, Rpr

ON PETITION FOR REHEARING

PER CURIAM.

The appellees petition for a rehearing on the grounds that Indiana Toll Road Commission v. Jankovich, 244 Ind. 574, 193 N.E.2d 237 (1963), cert. granted, 377 U.S. 942, 84 S.Ct. 1352, 12 L.Ed.2d 305 (1964), cert. dismissed as improvidently granted, 379 U.S. 487, 85 S.Ct. 493, 13 L.Ed.2d 439 (1965), a case not cited by either party, is controlling and requires that this Court's decision be set aside. We cannot agree.

In *Jankovich*, the Commission owned a toll road adjacent to an airport and contended that a zoning ordinance regulating the height of the toll road owned by them was invalid under Article 1, Section 21 of the Indiana Constitution, and the Fourteenth Amendment to the United States Constitution. The Supreme Court of Indiana sustained the Commission's contention. The Supreme Court of the United States granted a petition for certiorari but subsequently dismissed it as being improvidently granted. In so doing, the Court said:

"Needless to say, we express no opinion in this case regarding the validity under the United States Constitution of the city's airport zoning ordinance."

379 U.S. at 496, 85 S.Ct. at 497, n. 3.

The Court also stated:

" * * * The Indiana Supreme Court had before it a case in which the effect of the ordinance was to establish a maximum height of 18 feet for structures on respondent's land. Although it recognized that zoning regulations may be upheld as a reasonable exercise of the police power 'where the owner of property is merely restricted in the use and employment of his property,' 244 Ind., at 581, 193 N.E.2d, at 240–241, the court held that a taking requiring compensation rather than mere regulation—was effected here because 'the City of Gary has attempted, by the passage of the ordinance under consideration, to take and appropriate to its own use *the ordinarily usable* air space of property adjacent to the Gary Airport . . . .' 244 Ind., at 582, 193 N.E.2d, at 241. (Emphasis added.) As we read the opinion of the Indiana Supreme Court, it certainly does not portend the wholesale invalidation of all airport zoning laws."

379 U.S. at 493, 85 S.Ct. at 496–497.

The Minnesota Supreme Court considered airport zoning regulations in Minneapolis-St. Paul Metropolitan Airport Com'n v. McCabe, 271 Minn. 21, 135 N.W.2d 48 (1965). The court held that the M.A.C. had authority to promulgate zoning regulations controlling the use of vertical space in "airport hazard areas" lying within twenty-five miles of the City Halls of Minneapolis and St. Paul. It stated:

" * * * [I]t [is not] possible at this time to determine whether the operative effect of an ordinance proposed, but not yet adopted, will be to deprive any person of property without just compensation or will represent an unreasonable exercise of the police power.[10] [[10] Note, Jankovich v. Indiana Toll Road Comm., 379 U.S. 897, 85 S.Ct. 493, 13 L.Ed.2d 439.] We cannot anticipate and settle problems which may arise as between M.A.C. and the cities and villages located within its territorial ambit if a zoning ordinance promulgated by one of the legislatively created governmental bodies comes in conflict with an ordinance promulgated by another. For the present, we must assume that the matter will be fully explored at the public hearing contemplated by the statute and that the proposed ordinance will be amended and refined, in so far as necessary, so that in the end only those requirements or restrictions will be imposed which will be reasonably necessary to effectuate the purposes of the enactment as required by § 360.066."

*Id.* at 57.

A rereading of *Jankovich* and *McCabe* strengthens our conviction that the Minnesota Supreme Court will determine the

validity of zoning ordinances on the basis of whether the ordinance is a reasonable exercise of the police power. We remain convinced that were it to consider the ordinance passed by the St. Paul City Council in this case, it would hold that it was enacted pursuant to a valid exercise of that power.

We have also reviewed United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and Panhandle Eastern Pipe Line Co. v. State Highway Com., 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090 (1935), and associated decisions. We do not believe they are controlling here. See, Note, Jet Noise in Airport Areas: A National Solution Required, 51 Minn.L.Rev. 1087 (1967) and 31 Minn.L.Rev. 384 (1947).

The petition for rehearing is denied.

MEHAFFY, Circuit Judge (dissenting).

I respectfully dissent from the denial of the petition for rehearing primarily for the reasons stated in my dissenting opinion, which basically point up that the majority has failed to come to grips with the controlling question and has thereby reached a conclusion which in my view makes for an important and dangerous precedent proscribed by both the Fifth Amendment to the Federal Constitution and Article 1, § 13 of the Minnesota State Constitution. Simply stated, the sole and determinative question is: Can a municipality by enactment of an ordinance circumvent the plain mandate of the Constitution by the taking of private property without just compensation? The answer has to be "No."

The *Jankovich* case cited in the petition for rehearing and discussed in the majority per curiam opinion, while not dispositive of the crucial issue here, certainly affords no support for the decision reached by the majority. *Jankovich* lets stand a State supreme court decision which holds unconstitutional a height restriction ordinance purporting to authorize appropriation of air space without just compensation. If anything,

*Jankovich*, as well as other airport cases, *e. g.*, Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), and United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062 (1946), lends weight to the views expressed in my dissenting opinion.