**IZAAK WALTON LEAGUE OF AMERICA, a not for profit corporation, Plaintiff,**

v.

**George W. ST. CLAIR et al., Defendants, and Robert E. Gardner et al., Additional Defendants.**

**No. 5-69 Civ. 70.**

United States District Court, D. Minnesota, Fifth Division.

Jan. 5, 1973.

---

Popham, Haik, Schnobrich, Kaufman & Doty by Raymond A. Haik, Minneapolis, Minn., for plaintiff.

Robert G. Renner, U. S. Atty. by Arthur D. Smith, Dept. of Justice, Washington, D. C., for defendants Hardin, Cliff and Rupp.

Warren Spannaus, Atty. Gen., State of Minn. by Philip J. Olfelt, Special Asst. Atty. Gen., for defendants Leirfallom and Logan.

Sullivan, Hanft, Hastings, Fride & O'Brien by William P. O'Brien and Gaylord Swelbar, Duluth, Minn., for defendants St. Clair, Robert E. Gardner, Evelyn A. Gardner, William A. Gardner, Marea B. Gardner, Jane G. Head, Murdock Head, Michigaumi Iron Co. and Muskegon Bank and Trust Co.

NEVILLE, District Judge.

This declaratory judgment action is brought by the Izaak Walton League of America, a non-profit organization formed in 1922, which interests itself *inter alia* in the field of conservation and the use of land areas in the United States. One area in which it has been extremely active is the Boundary Waters Canoe Area (BWCA) in Northern Minnesota extending many miles along the Canadian border and embodying a great many lakes and streams, containing 1,031,204 acres approximately, and a part of the larger area known as the Superior National Forest. It alleges that it long has supported the Federal and State governments in securing legislation protecting wilderness areas generally and that in connection with the BWCA it further went to the extent of purchasing some 7,000 acres, later selling or transferring the same to the United States at something less than its purchase price.

Defendants are (1) George W. St. Clair[1], who claims to be the lessee of mineral rights underlying approximately 150,000 acres of land in the BWCA, (2) the so-called "Federal defendants" i.e., the United States Secretary of Agriculture, the Chief of the United States Forest Service and the Supervisor of the Superior National Forest, the three of whom regulate and manage the national forests and the BWCA, (3) the so-called "State defendants", i. e., the State of Minnesota Conservation Commissioner and the Commissioner of Taxation, both of whom in different ways have jurisdiction over State lands, and (4) a number of other defendants who are lessors to St. Clair as owners of the mineral rights, later joined by the court by order dated April 19, 1971.

The BWCA is an irregularly shaped area extending 110 miles more or less from east to west hugging the Canadian border and at places measuring 30 miles or more from north to south. Included within it are hundreds of lakes and

---

1. Thomas Yawkey originally was named as a defendant but on agreement of counsel the case was dismissed as to him by order dated April 19, 1971 subject to certain conditions since his counsel stated he no longer owns or leases any mineral interests in the BWCA and that in any event he agreed to be bound by the outcome of this litigation should it later develop he does own some such interest.

streams through which one in a canoe, with numerous portages, can pass virtually from one end to the other in an east-west direction said to be the "Highway of the Voyageurs" of the 18th Century. It complements and abuts the Quetico Superior Park on the Canadian side of the border, subject to certain international agreements and treaties including the Webster-Ashburton Treaty of 1842. With the exception of logging largely years ago and certain scarring by forest fires, the area remains substantially in a natural state with large stands of virgin timber. All former private resorts in the area have now been or are being removed and closed and travel in the area by airplane, motor boat or any motorized vehicle is strictly prohibited. It is a roadless area and the establishment of camps is rigidly regulated. Other regulatory means exercised both by the State and Federal governments are employed to keep the area in its pristine condition. From 100,000 to 150,000 people a year including Boy Scout troops and others from all over the United States are said to enter the area and canoe, tramp or camp therein.

From a stipulation of facts filed by counsel it appears that approximately 71.3% or 742,800 acres within the BWCA are owned by the United States, 26.3% including lake beds by the State of Minnesota, 1.4% by counties and approximately 1% privately, though gradually by condemnation, expiration of life estates and otherwise this 1% is decreasing. On the other hand of the underlying mineral rights, the United States owns only 44% or 458,224 acres, the State of Minnesota and counties the same 26.3% and 1.4% with the remaining 28.3% of the mineral rights, including the St. Clair claims, held in private ownership.

The case here arises because during 1969 defendant St. Clair, through various employees and agents, entered BWCA with the Federal defendants' permission and undertook surface mineral exploration, establishing a base camp and other more temporary encampments. Travel was by canoe. In December, 1969, St. Clair gave notice that core drilling was planned, which would involve the use of mechanical equipment, access overland and permanent camps. The Federal officials in charge besides permitting the original entry authorized the establishment of the original base camp for a period longer than normally permitted by applicable regulations. Exploratory mining operations generally are not uses contemplated or permitted by the BWCA regulations (the substantial argument being whether they are so prohibited). As to the core drilling request, the Federal defendants on receipt of it requested information concerning St. Clair's right and title to the tracts of land on which he intended to drill. Prior to being furnished such, the present lawsuit was commenced. No action has been taken on the application by either of the Federal defendants nor has any administrative determination been made.

After the commencement of this lawsuit, St. Clair's exploration activities ceased at the request of or on order from the Forest Service. The equipment used by St. Clair originally was stored at the base camp site he had established. The original reservation and severance of the mineral rights St. Clair now seeks to exercise were effected approximately 38 years ago, principally in the year 1934, with some in 1929, one tract in 1935, and the last in 1936. St. Clair, however, did not acquire his rights as a lessee until quite recently, in 1969 for the most part. Plaintiff proceeds on various legal theories and prays a judgment in short declaring St. Clair and his agents to have no authority or right to enter BWCA for the purpose of exploring, drilling for or removing minerals and enjoining both the Federal and State defendants from permitting such.

PROCEDURAL HISTORY OF CASE

A motion for preliminary injunction became moot when it was reported to the court that St. Clair's equipment had been stored and that no further entry

would be made or exploration activity conducted pending the determination of this declaratory judgment action. This court, by order dated June 1, 1970, Izaak Walton League of America v. St. Clair, 313 F.Supp. 1312 (D.Minn.1970), denied the motion of the Federal defendants to dismiss on the grounds that the complaint fails to state a cause of action, that the United States had not consented to suit against it and that plaintiff lacks standing. Subsequently the Federal defendants filed an answer requesting dismissal and taking the view that what they permitted as to St. Clair or might so do in the future either as to him or others is properly an administrative matter and not within the purview of the court's jurisdiction in an action such as this. Meantime, the State defendants answered, stating in part "Defendant Commissioner of Conservation agrees generally with the nature of the claim . . . subject however to specific denials, affirmations and additional allegations . . .", but contending that the land in the BWCA should be subject to mining activity only as "related to a national emergency". The State defendants have cross-claimed against the Federal defendants in support of the plaintiff's request for permanent injunction. Defendant St. Clair has answered in general denying the allegations of the complaint and the cross-complaint as have his lessors who were joined as additional defendants by order of this court of April 19, 1971, which order also denied various dismissal motions. Subsequently the State defendants moved to amend their answer and cross-claim to assert that the lands in which St. Clair claims mineral rights were, prior to the year 1900, separated fraudulently from the public domain under the then applicable federal homesteading law and therefore no private titles thereto can or do exist and title remains in the United States. Exhibits and briefs presented would indicate some substance to the claim, had it been timely presented years ago. The court denied leave so to amend, however, on May 15, 1972 Izaak Walton League v. St. Clair, 55 F.R.D. 139 (D.Minn.1972), holding as a matter of law that even if established, such facts at this late date would not constitute a defense in view of the statute of limitations. Subsequently at the court's instance, argument was held for a full day at Duluth, Minnesota on September 15, 1972. The legal questions are now ripe for decision.

## CONGRESSIONAL HISTORY

The statutory and administrative history behind the BWCA is rather lengthy. March 3, 1891 Congress directed that "The President of the United States may, from time to time, set apart and reserve, in any State . . . having public land bearing forests . . . any part of the public lands . . . as national forests . . . by public proclamation." 16 U.S.C. § 471. By Congressional Act of June 4, 1897, 16 U.S.C. § 473 et seq., detailed provisions were made for administration and regulation of national forests, including sale and use of timber, egress or ingress of actual settlers and tourists and other matters. Jurisdiction as of today is in the hands of the United States Forest Service, a division of the Department of Agriculture, and thus subject to regulations prescribed by the Secretary of Agriculture. This Act provided, however, 16 U.S.C. § 478:

"Nor shall anything herein prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof."

Also, 16 U.S.C. § 482 contains the following language:

". . . And any mineral lands in any national forest which have been or which may be shown to be such, and subject to entry under the existing mining laws of the United States and the rules and regulations applying thereto, shall continue to be subject to such location and entry, notwithstanding any provisions contained in sections 473–482 and 551 of this title."

Though in 1893 lands in Minnesota were withdrawn from the general mining laws [2] authorizing location and patenting of minerals in public domain lands, it is quite clear that Congress in early legislation did not intend to remove national forest land from mineral exploration. 16 U.S.C. § 475 speaking of National forests contains the provision:

". . . but it is not the purpose or intent of these provisions . . . to authorize the inclusion therein [national forests] of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes."

As late as 1950, 16 U.S.C. § 508b, Congress passed an Act providing as to previously withdrawn land for the prospecting and for the development and utilization of such mineral resources.

In 1909 by proclamation President Theodore Roosevelt established the Superior National Forest, an area of approximately 3,000,000 acres. Included within it is what is now the 1,031,204 acres of the BWCA. The President thus at that time, though given the statutory right to revoke his proclamation in whole or in part, 16 U.S.C. § 473, made a finding at least inferentially that the Superior National Forest was more valuable for forest than for mineral. To date no President nor Congress has ever sought to reverse this position nor to proclaim otherwise.

In or prior to 1927 the Secretary of Agriculture, pursuant to authority vested in him by the Act of June 4, 1897, see 16 U.S.C. § 551, established the first roadless area in the Superior National Forest. See United States v. Perko, 108 F.Supp. 315, 316 (D.Minn.1952), aff'd Perko v. United States, 204 F.2d 446 (8th Cir. 1953), cert. denied 346 U.S. 832, 74 S.Ct. 48, 98 L.Ed. 355 (1953). Thereafter other roadless areas were established which, when all combined became by regulation promulgated January 27, 1958 the BWCA and was so renamed.[3] Meantime, a Presidential Proclamation banning airplane flights below 4,000 feet over the roadless area of the Superior National Forest was held valid by judges of this court against a challenge of unconstitutionality. United States v. Perko, *supra*. See companion cases of United States v. Perko, 8 Cir., 133 F.Supp. 564 (D.Minn. 1955); 141 F.Supp. 372 (D.Minn.1956); Bydlon v. United States, 146 Ct.Cl. 764, 175 F.Supp. 891 (1959).

In 1930 Congress passed what came to be known as the Shipstead-Newton Nolan Act, 16 U.S.C. § 577 et seq., withdrawing from public entry or appropriation under land laws of United States the public lands in the Superior National Forest.[4] By the Thye-Blatnik Act of June 1948, as later amended, the Secretary of Agriculture was given authority to purchase land from private individuals, subject however to 16 U.S.C. § 513 et seq., the Weeks Act of 1911, which required originally that any reservation of rights, where a deed was given to the United States must spell out the time within which minerals shall be removed and rules and regulations under which such could be done. As amended in 1913 this section provides:

"Such . . . reservations retained by the owner from whom the United States receives title, shall be subject to the rules and regulations prescribed by the Secretary of Agriculture . . . and such rules and regulations shall be expressed in and

---

2. 30 U.S.C. § 48 made inapplicable 30 U.S.C. § 22 which latter permitted a prospector who filed a claim to follow, within limits, the vein or lode in accordance with the customs and laws in force at the date of the location.

3. The Superior Roadless Area was established in 1939 and in 1948 the Little In-

dian Sioux and the Caribou Roadless Areas were announced.

4. This statute recites as a purpose "conserving the natural beauty of shore lines for recreational use". It also limited logging privileges and actions affecting water levels. 16 U.S.C. § 577a.

made part of the written instrument conveying title to the lands to the United States . . . ." 16 U.S.C. § 518.

There are thus two categories or types of reservations: those reserved by grantors in deeds to the United States and those already existing in third parties at the time the United States acquired the surface rights. In the former, the United States may prescribe conditions and incorporate its regulations.

The most recent Congressional Act is the so-called National Wilderness Act of 1964, 16 U.S.C. § 1131 et seq. By 16 U.S.C. § 1133(d)(5) the BWCA was expressly statutorily recognized as a distinct area:

"Other provisions of this chapter to the contrary notwithstanding, the management of the Boundary Waters Canoe Area, formerly designated as the Superior, Little Indian Sioux, and Caribou Roadless Areas, in the Superior National Forest, Minnesota, shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages."

This section makes no reference to minerals, but two sections of the same Act, 16 U.S.C. § 1133(d)(2) and (3) provide as follows:

"(2) Nothing in this chapter shall prevent within national forest wilderness areas any activity, including prospecting, for the purpose of gathering information about mineral or other resources, *if such activity is carried on in a manner compatible with the preservation of the wilderness environment.* Furthermore, in accordance with such program as the Secretary of the Interior shall develop and conduct in consultation with the

Secretary of Agriculture, such areas shall be surveyed on a planned, recurring basis consistent with the concept of wilderness preservation by the Geological Survey and the Bureau of Mines to determine the mineral values, if any, that may be present; and the results of such surveys shall be made available to the public and submitted to the President and Congress." [Emphasis added]

"(3) Notwithstanding any other provisions of this chapter, until midnight December 31, 1983, the United States mining laws and all laws pertaining to mineral leasing shall, to the same extent as applicable prior to September 3, 1964 [5] extend to those national forest lands designated by this chapter as 'wilderness areas'; *subject, however, to such reasonable regulations governing ingress and egress as may be prescribed by the Secretary of Agriculture consistent with the use of the land for mineral location and development and exploration, drilling, and production,* and use of land for transmission lines, waterlines, telephone lines, or facilities necessary in exploring, drilling, producing, mining, and processing operations, including where essential the use of mechanized ground or air equipment and restoration as near as practicable of the surface of the land disturbed in performing prospecting, location, and, in oil and gas leasing, discovery work, exploration, drilling, and production, as soon as they have served their purpose. Mining locations lying within the boundaries of said wilderness areas shall be held and used solely for mining or processing operations and uses reasonably incident thereto". [Emphasis added]

The Act further provides: 16 U.S.C. § 1133(c)

"Except as specifically provided for in this chapter, and *subject to existing private rights,* there shall be no

---

5. As pointed out in footnote 2 *supra*, the United States mining laws were not applicable prior to September 3, 1964 to Minnesota lands. Thus this section by its very wording has no application to the BWCA.

commercial enterprise and no permanent road within any wilderness area designated by this chapter and, except as necessary to meet minimum requirements for the administration of the area for the purpose of this chapter (including measures required in emergencies involving the health and safety of persons within the area), there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation within any such area."

## REGULATIONS OF THE SECRETARY OF AGRICULTURE

Some fifteen months after the passage of the Wilderness Act and on December 21, 1965, the Secretary of Agriculture adopted 36 C.F.R. § 251.85 titled "Special provisions governing the BWCA, Superior National Forest". In material part, these read as follows:

"Subject to existing private rights, the lands now owned or hereafter acquired by the United States within the Boundary Waters Canoe Area of the Superior National Forest, Minn., as formerly designated under Reg. U–3 (§ 251.22) and incorporated into the National Wilderness Preservation System under the Wilderness Act of September 3, 1964, shall be administered in accordance with this regulation for the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, *the primitive character of the Area, particularly in the vicinity of lakes, streams, and portages.*

.    .    .    .    .    .

(b) Except as provided in the Wilderness Act, in this section and in §§ 251.27, 251.28, and 251.30, and *subject to existing private rights,* there shall be no commercial enterprises and no permanent roads within the Boundary Waters Canoe Area and there shall be no temporary roads, no use of motor vehicles, motorized equipment, or mo-

torboats, no landing of aircraft, and no other form of mechanical transport.

(1) All uses that require the erection of permanent structures and all permanent structures except as herein provided, are prohibited in the Boundary Waters Canoe Area. The Chief, Forest Service, may permit temporary structures and commercial services within the Boundary Waters Canoe Area to the extent necessary for realizing the recreational or other wilderness purposes, which may include the public services generally offered by outfitters and guides.

.    .    .    .    .    .

(3) The overland transportation of any watercraft by mechanical means, including the use of wheels, rollers, or other devices, is prohibited    .    .    .    .

(4) No motor or other mechanical device capable of propelling a watercraft through water shall be transported by any means across National Forest land except over routes designated by the Chief, Forest Service

.    .    .    .

.    .    .    .    .    .

(c) No permanent or semipermanent camp may be erected or used on National Forest land except as authorized in connection with a reserved right, or in the Portal Zone in connection with the harvest and removal of timber and other forest products.

.    .    .    .    .    .

(f) Nothing in this regulation shall be construed as affecting the jurisdiction or responsibility of the State of Minnesota with respect to wildlife and fish in the National Forest.

(g) The State of Minnesota, other persons, and their successors in interest owning land completely surrounded by National Forest land shall be given such rights as may be necessary to assure adequate access to that land. Such rights may be recognized in stipulations entered into between the Forest Service and the private owner or State. Such stipulations may pre-

scribe the means and the routes of travel to and from the privately owned or State land which constitute adequate access *and any other conditions reasonably necessary for the preservation of the primitive conditions within the Boundary Waters Canoe Area.*"

December 1964 the BWCA Review Committee appointed by the then Secretary of Agriculture submitted a ten-page report containing *inter alia* a recommendation:

"18. It is recommended that all pending applications for mineral prospecting permits pertaining to the BWCA be reviewed and that action be taken to withdraw consent where previously given. It is recommended that the Secretary of Agriculture withhold consent on all present and future applications.

The Committee supports the 1954 statement by former Forest Service Chief McArdle that mining not be allowed in the BWCA except in a national need and emergency. Full mineral development should be continued on the portion of the Superior National Forest outside the BWCA."

In response to this report the Secretary of Agriculture issued a statement January 12, 1965 reading in part as follows:

"IV. *Mining Activities*

The Committee recommends, in summary, that consent of the Department of Agriculture not be given for mining and mineral leasing in the Boundary Waters Canoe Area, except in a national emergency, and that private mineral rights within the Canoe Area should be acquired.

. . . . . .

We will follow the policy of withholding consent on future applications for mineral prospecting permits in the Canoe Area except in cases of national emergency. As recommended by the Committee, we will withdraw consent previously given where we can.

I accept the view that mineral development should proceed outside of the Canoe Area."

### STATE OF MINNESOTA LAWS AND POLICY

Minn.Stat. § 92.45 (1923) recognizes in general the federal jurisdiction over the BWCA and the restrictions imposed by 16 U.S.C. § 577–577b. Minn.Stat. § 1.045 gives the State's consent to acquisition by the Federal Government of land in the Superior National Forest. In general the State has enacted legislation complementary to the Federal legislation. Minn.Stat. §§ 84.43–84.521. The State Department of Conservation has pursued substantially the same policies as the Federal Department of Agriculture, and the State's regulations for purpose of this case are substantially in accord. No State permits nor leases have been given for mineral exploration of any land owned by the State of Minnesota in the BWCA. Minnesota passed the "Little Shipstead Nolan Act" of 1933 Minn.Stat. § 110.13 and in 1947 by Joint Resolution importuned Congress to enact laws to preserve the Wilderness Area. The "Little Wilderness" Act Minn.Stat. § 84.43–84.52 limited air and motorboat traffic in the area. The State's administrative activities have been diligent for many years in an effort to preserve the Wilderness character of BWCA, including participation in international conferences with Canada, prosecutions for trespass and of an offending pilot, opposition to the building of proposed roads, the prohibition of bringing cans and bottles within the BWCA, regulations relating to game and fish and other similar actions. The State's pronouncement of its public policy is very clear as to BWCA, reference being made to its "Matchless scenic beauty of inestimable value from the recreational and tourist viewpoint." The State of Minnesota obviously is as anxious to preserve the BWCA as is the Congress judging from the State's past activities and indeed from the answer and cross-claim of its

officers in this suit. Its position differs from that of the Izaak Walton League only in that the latter desires a complete prohibition of all mining activities whereas the State would except from the injunction activities "related to a national emergency."

The State's position dates back really to 1902 when its Chief Fire Warden recommended lands be set aside for what later in 1909 became the Superior National Forest. Substantial State effort was made during the 1920's and thereafter in opposing a hydroelectric project proposed for the area, and later in opposing the so-called "Gun Lake" road. The State cites all of the above as evidence of an adopted statutory and administrative policy to which the court should give weight in its determination.

## PARTIES' CONTENTIONS

The questions before the court for decision are several. Plaintiff and the State defendants on their cross-claim contend the BWCA has been effectively zoned against any kind or sort of commercial activity including mining and mining exploration under either or both State and Federal statutes and regulations and that in any event defendant St. Clair and his lessors have abandoned any claims they might have had to mineral rights and/or are guilty of laches or are estopped.

Defendant St. Clair asserts two basic contentions. First that Congress did not intend to ban the exercise of mineral rights in Wilderness areas including BWCA and second, even if it had so intended, attempting so to do would constitute a deprivation of defendants' property without due process of law. The Federal defendants in general join defendant St. Clair's position but more directly continue to stand on the proposition that this declaratory judgment suit is premature since administratively the Forestry Service never has passed on St. Clair's application for core drilling in the BWCA. These defendants join St. Clair and the others in asking for a dismissal of the action.

## ZONING

This court is satisfied, if it can be said that Congress intended to bar all mineral activities in the BWCA, that it has the power and prerogative so to do. The wilderness purpose is a public one and the proscription and regulations are in this court's opinion reasonable. Rarely does zoning take place without someone suffering some impairment of the unbridled right of use of property and often perhaps some depreciation in value.

It is well established that governmental bodies do have the right to zone property against certain uses, even though to some extent such deprives the owner of some of the purposes to which he could devote his property. The most common example is in cities where certain areas are zoned commercial, others industrial and still others residential with a variety of intermediate classifications. Argument is made that zoning is the exercise of a police power; that police power is limited to the states since the Federal government has no inherent police power; that the zoning cases cited by plaintiff are instances of state or municipal regulations and not an attempt by the Federal government to exercise inherent zoning power. While in general this stands as a correct proposition, it would seem not to be applicable here in a situation where the Federal government is controlling and regulating the use of its own land and land of the State of Minnesota where the state in turn has explicitly recognized the Federal government's right so to regulate, control and thus to zone the property. In the BWCA the State of Minnesota has bowed to the jurisdiction of the Federal government and has in fact cooperated with it. Zoning is appropriate even though it may require abandonment of uses to which the property has previously been devoted. Persuasive here is the case of Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915). In the *Hadacheck* case the court upheld a Los Angeles City ordinance prohibiting the operation of brick

kilns despite the fact that when defendant purchased his property for the purpose of mining its extensive clay deposits and to operate kilns it was not situate within the City of Los Angeles. Though this resulted in a substantial reduction in valuation of the property the Supreme Court upheld the validity of the zoning ordinance. The most recent case which the court has been able to find in the Eighth Circuit is City of St. Paul v. Chicago, St. Paul, Mpls. and Omaha Ry., 413 F.2d 762 (8th Cir. 1969). In this case the court upheld the zoning ordinance regulating building heights and placing restrictions on erecting structures adjoining a city park in a downtown river front area. The lower court found such depreciated the value of the property from $320,000 to $150,000. What the court there said is very appropos to the case at bar and a more clear iteration of the applicable principles than this court could restate (p. 766):

". . . They argue, however, that the ordinance is violative of the Fifth Amendment to the United States Constitution and Article 1, Section 13 of the Minnesota Constitution in that it takes the railroad's property without compensation.

Neither constitutional provision interposes a barrier to the imposition of restrictions on the use of private property if a zoning ordinance is enacted pursuant to a valid exercise of the police power. Goldblatt v. Town of Hempstead, 369 U.S. 590, 593, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); [8] City of Marysville v. Standard Oil Co., 27 F.2d 478 (8th Cir. 1928), aff'd, Standard Oil Co. v. Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856 (1929); Kiges v. City of St. Paul, 240 Minn. 522, 62 N.W.2d 363, 369–370 (1953); State ex rel. Beery v. Houghton, 164 Minn. 146, 204 N.W. 569, 54 A.L.R. 1012 (1925), aff'd mem., 273 U.S. 671, 47 S.Ct. 474, 71 L.Ed. 832 (1927). [9] The test of whether the enactment falls within that power is one of reasonableness.

The zoning ordinance will be sustained unless its ' * * * provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.' Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). Gorieb v. Fox, 274 U.S. 603, 608–609, 47 S.Ct. 675, 71 L.Ed. 1228 (1927); McMahon v. City of Dubuque, Iowa, 255 F.2d 154, 158–159 (8th Cir.), cert. denied, 358 U.S. 833, 79 S.Ct. 53, 3 L.Ed.2d 70 (1958); Naegele Outdoor Adv. Co. v. Village of Minnetonka, 281 Minn. 492, 162 N.W.2d 206, 212 (1968); State ex rel. Howard v. Village of Roseville, 244 Minn. 343, 70 N.W.2d 404, 407 (1955).

In reviewing the trial court's determination of invalidity, we examine the record not to see whether its findings are supported by evidence but to ascertain upon the whole record whether it is possible to say that the legislative choice is without rational basis. South Carolina State H. Dept. v. Barnwell Bros., 303 U.S. 177, 191–192, 58 S.Ct. 510, 82 L.Ed. 734 (1938); Weinberg v. Northern Pac. Ry. Co., 150 F.2d 645, 648 (8th Cir. 1945).

Fairly debatable questions as to the reasonableness, wisdom and propriety of an ordinance are not for the determination of the courts but for that of the legislative body on which rests the duty and responsibility of the decision. Standard Oil Co. v. Marysville, supra; Naegele Outdoor Adv. Co. v. Village of Minnetonka, [281 Minn. 492,] 162 N.W. 2d at 209.

The mere fact that the ordinance seriously depreciates the value of the complainants' property is not enough to establish its invalidity. Goldblatt v. Town of Hempstead, supra at 594, 82 S.Ct. at 990,[10] American Wood Products Co. v. City of Minneapolis, 21 F.2d 440, 444 (D.Minn.1927) (J. Sanborn), aff'd, 35 F.2d 657 (8th Cir. 1929); Kiges v. City of St. Paul, [240 Minn. 522,] 62 N.W.2d at 369. Nor can it be invalidated on the grounds that aesthetic considerations

will be furthered if it is permitted to stand. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); [11] Naegele Outdoor Adv. Co. v. Village of Minnetonka, *supra*; [12] State ex rel. Twin City Bldg. & Inv. Co. v. Houghton, 144 Minn. 1, 174 N.W. 885, 176 N.W. 159, 162, 8 A.L.R. 585 (1920).[13]

8. ' " * * * The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public is not—and, consistently with the existence and safety of organized society cannot be—burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community." '
Goldblatt v. Town of Hempstead, 369 U.S. 590, 593, 82 S.Ct. 987, 989, [8 L.Ed.2d 130] (1962).

9. 'The public use, which sustains the taking of property under the power of eminent domain upon compensation paid, differs from the public interest or welfare which justifies the restriction of the individual in the use of his property without compensation, in consideration of the public interest and common welfare of the community. * * *

* * * * *

'Zoning statutes are becoming common. The police power in its nature indefinable, and quickly responsive, in the interest of common welfare, to changing conditions, authorizes various restrictions upon the use of private property as social and economic changes come. A restriction, which years ago would have been intolerable, and would have been thought an unconstitutional restriction of the owner's use of his property, is accepted now without a thought that it invades a private right. As social relations become more complex, restrictions on individual rights become more common.'
State ex rel. Beery v. Houghton, 164 Minn. 146, 204 N.W. 569–570 (1925), aff'd mem., 273 U.S. 671, 47 S.Ct. 474 [, 71 L.Ed. 832] (1927).

10. 'This is not to say, however, that governmental action in the form of regulation cannot be so onerous as to constitute a taking which constitutionally requires compensation. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 * * *. There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant, see Pennsylvania Coal Co. v. Mahon, supra, it is by no means conclusive, see Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 * * *, where a diminution of value from $800,000 to $60,000 was upheld. * * * '
Goldblatt v. Town of Hempstead, *supra* at 594, 82 S.Ct. at 990 [, 8 L.Ed.2d 130].

11. ' * * * The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.'
Berman v. Parker, 348 U.S. 26, 33, 75 S. Ct. 98, 103 [, 99 L.Ed. 27] (1954).

12. ' * * * The mere fact that the adoption of a zoning ordinance reflects a desire to achieve aesthetic ends should not invalidate an otherwise valid ordinance. Thus, if the challenged restriction is reasonably related to promoting the general welfare of the community or any other legitimate police power objective, the fact that aesthetic considerations were a significant factor in motivating its adoption cannot justify holding it unconstitutional. * * * *.' (Citations omitted.)
Naegele Outdoor Adv. Co. v. Village of Minnetonka, 281 Minn. 492, 162 N.W.2d 206, 212 (1968).

13. ' * * * It is time that courts recognize the aesthetic as a factor in life. Beauty and fitness enhance values in public and private structures.'
State ex rel. Twin City Bldg. & Inv. Co. v. Houghton, 144 Minn. 1, 176 N.W. 159, 162 (1920)."

413 F.2d at 766–768.

■ The Minnesota Supreme Court has consistently upheld reasonable zoning ordinances, Alexander Co. v. City of Owatonna, 222 Minn. 312, 24 N.W.2d 244 (1946); Northwestern Tele. Exchange Co. v. City of Minneapolis, 81 Minn. 140, 83 N.W. 527 (1900), 86 N.W. 69 (1901); State ex rel. Beery v. Houghton, 164 Minn. 146, 204 N.W. 569

(1925). It seems to the court here that if such is what Congress intended, Congress clearly had the power to zone the BWCA in view of the public purpose to keep it virginal and untrammeled. Applying the tests in the *City of St. Paul* case quoted above, it seems patent that the regulation of the BWCA is not clearly arbitrary and unreasonable, that such does have a substantial relation to a public purpose and has a rational basis. The fact that zoning may seriously depreciate the value of property or that aesthetic consideration will be furthered is not a ground for invalidation of zoning. Naegele Outdoor Adv. Co. v. Village of Minnetonka, 281 Minn. 492, 162 N.W. 2d 206 (1968). Whether mineral rights owners might be able to claim a "taking" so as to be able to assert a cause of action in the Court of Claims under the Tucker Act 28 U.S.C. § 1491 is not a question now before the court.

The power of the Federal government to create and regulate wilderness areas for recreational purposes for the public has been held to exist in other cases. United States v. Gregg, 290 F.Supp. 706 (W.D.Wash.1968) (air regulations); McMichael v. United States, 355 F.2d 283 (9th Cir. 1965) (motor vehicle regulations); United States v. Foresyth, 321 F.Supp. 761 (D.Colo.1971) (core drilling etc.); see also West Virginia Highlands Conserv. v. Island Greek Coal Co., 441 F.2d 232 (4th Cir. 1971).

## ABANDONMENT, LACHES, EQUITIES

One position taken by plaintiff and the State is that the court need not decide the question of the power of the Federal government to zone or whether Congress did in fact so intend. They point out that though the mineral rights have existed in a severed title for some 38 years more or less during all of which time the Superior National Forest was being promoted and developed at an expenditure of more than 12½ million dollars and during which time the 1964 Wilderness Act was passed, no action was taken or attempted to be taken by the owners to exercise their mineral rights until after the BWCA concept was fully matured and the area began to have its most extensive Wilderness appeal for tourists.

Actually St. Clair, according to the stipulation of facts filed herein, acquired his leases for the most part in 1969, with one in 1967, one in 1968 and one in 1970. There is no evidence before the court as to the terms thereof. However, both the severance of the mineral rights as separate titles or estates in 1929 and the recent acquisition of leases by St. Clair occurred after the establishment in 1927 of the first roadless area and as to St. Clair's acquisition, long after the passage of the Wilderness Act of 1964. The direction the Federal and State governments were taking was by this time clear.[6] From this premise

6. See United States v. Perko, 108 F.Supp. 315, 317 (D.Minn.1952), where the court stated:

"This first road ban regulation in the Superior National Forest was promulgated before there was any extended use of aircraft as a means of travel into remote recreational areas, and was prompted no doubt by a policy to preserve the unique character of this national forest which extends along the Canadian border for many, many miles. To the north of a substantial portion of the forest, Canada has established a national park. The general area constitutes one of the last wilderness areas in the United States. From the days of the voyageurs, it has been a canoe country, and the innumerable lakes and connecting streams with adjacent portages furnish an almost endless variety of trips by water. Perhaps no other place in the United States is so steeped in the lore of the Indian and fur trader, who traditionally used these waterways before the Northwest was settled. Public interest in the conservation of this area so that it might be retained in its primitive condition undoubtedly motivated the Secretary of Agriculture in establishing regulations so that the intrusion of automobiles and other vehicles would not destroy the unique recreational appeal of this Forest Reserve. The Roadless Areas have been augmented from time to time and now

the State and plaintiff argue that defendant St. Clair, and his lessors, are mere speculators hoping to advantage themselves as opportunists. It is true that at no time since the severance from the title of the mineral rights, have either the owners or lessees been required to pay any Minnesota real estate taxes thereon. The Minnesota Supreme Court long has held that mineral rights are an estate of inheritance. Washburn v. Gregory Co., 125 Minn. 491, 147 N.W. 706 (1914); Wichelman v. Messner, 250 Minn. 88, 83 N.W.2d 800 (1957). A tax against a particular tract was held not to be a lien upon or attach to the minerals therein where separately owned. Minn.Stat. § 93.52 et seq. now and since 1969 requires a form of recordation of mineral interests with the Register of Deeds or Registrar of Titles, but heretofore there has been no such requirement.

■■ There is no merit in the bare bones contention that failure to pay any real estate taxes on mineral rights in some way or other forfeits them, for reserved mineral rights have never been separately assessed nor subject in Minnesota to real estate taxes. Yet the law and decided cases have permitted deliberate attempts to arrange real estate transactions whereby the grantor and his heirs retained a speculative mineral interest for generations without having to pay taxes or any carrying charges, to the end that if mineral in merchantable quantities ever were discovered, the holder could interfere with the surface rights to realize upon his speculation. Defendant St. Clair and his lessors are in this class. The court does not believe it can find as such an intent for abandonment, nor the existence of laches, without an evidentiary factual hearing, but must recognize in view of the above facts that the equities are not strong in favor of defendant St. Clair and his lessors. Their speculative purpose and obvious knowledge flies directly in the face of what plaintiff and the State and Federal governments are attempting to do to preserve the BWCA and whereas in a technical sense the law of bona fide purchase is not applicable, such equitable considerations are properly considered by the court. The State in particular has advanced a theory of trusteeship claiming that under such cases as Klass v. Twin City Federal Savings and Loan Ass'n, 291 Minn. 68, 190 N.W.2d 493 (1971), and Heywood v. Northern Assurance Co., 133 Minn. 360, 158 N.W. 632 (1916), defendants St. Clair and his lessors have unjustly enriched themselves. The court does not see these cases or this theory as particularly apposite here, which is not to say, however, that any injustice will be done if these defendants are held to be some sort of constructive trustees for the public on the basis of being speculators knowing the trend of the BWCA development history.

---

aggregate approximately one million acres. They are commonly known as Superior, Little Indian Sioux, and Caribou Roadless Areas. . . . [108 F.Supp. at 317]

. . . . . . .

. . . The conservation of this wilderness tract is an outgrowth of years of government planning. Drastic curtailment of any exploitation by the use of the water therein for commercial purposes has been attained by congressional enactment. Public lands have been withdrawn from entry, and logging along certain waterways has been definitely restricted in order to 'conserve the natural beauty of shore lines for recreational use.' The Roadless Area was created by the Secretary of Agriculture in order to conserve the uniqueness of this region for the type of public recreation for which it was singularly adapted. That purpose and the general policy of the Government, as manifested in so many ways by congressional action and the legislative history, is now threatened by unrestricted airplane travel to and from that area. One of the effective barriers against the spoilation of the primitiveness of this canoe country was the establishment of the Roadless Area. This barrier, of course, will be circumvented entirely by the use of airplane travel, not only to the comparatively few resorts now located therein, but by airplane travel to and from the many lakes which will be used as landing fields for public and private air travel transportation." [108 F.Supp. at 320]

## ACCESS TO MINERAL RIGHTS

Plaintiff and the State contend that St. Clair and the mineral rights owners can obtain access to their land only by using State controlled waters or by traversing other properties owned either by the Federal government or the State of Minnesota; that there were no grants of easements over other properties giving them access such as might be where a grantor deeds off a portion of his property, retaining the balance which landlocks the granted portion and where courts have implied an easement. Here the adjoining property, over which mineral rights owners would of necessity have to travel was, so far as appears, never owned by common grantors. To gain meaningful access to the property other than by canoe and portage, some overland roadway or railroad right-of-way would have to be established, cutting through the heart of the BWCA, or some exception carved out of the air ban which this court long ago has upheld. See United States v. Perko *supra*. In answer, defendant St. Clair points to 16 U.S.C. § 1133(c), (d)(2) and (3) and 1134(a) and (b) and to the Department of Agriculture Regulations 36 C.F.R. §§ 251.81, 251.82 and 251.85(g), the former of which read as follows:

"251.81 Access to surrounded State and private lands.

States or persons, and their successors in interest, who own land completely surrounded by National Forest Wilderness shall be given such rights as may be necessary to assure adequate access to that land. 'Adequate access' is defined as the combination of routes and modes of travel which will, as determined by the Forest Service, *cause the least lasting impact on the primitive character of the land and at the same time will serve the reasonable purposes for which the State and private land is held or used.* . . ." [Emphasis added]

"251.82 Access to valid mining claims or valid occupancies.

Persons with valid mining claims or other valid occupancies wholly within National Forest Wilderness shall be permitted access to such surrounded claims or occupancies *by means consistent with the preservation of National Forest Wilderness which have been or are being customarily used with respect to* other such claims or occupancies surrounded by National Forest Wilderness. The Forest Service will, when appropriate, issue permits which shall prescribe the routes of travel to and from the surrounded claims or occupancies, the mode of travel, and other conditions reasonably necessary to preserve the National Forest Wilderness." [Emphasis added]

Attention also is called to Regulation 36 C.F.R. § 251.83 which is rather extensive but spells out in some detail treatment that should be accorded those who owned mining claims "prior to inclusion of the land within the National Wilderness Preservation System." Plaintiff and the State answer this by arguing that the regulations are subject to the statute and the Secretary of Agriculture either overlooked the fact of the special statutory treatment of BWCA or intended these regulations not to apply to it. Whatsoever that rationale, it is factually clear that some means of access either by air, water or over land will of necessity be required and *pro tanto* will destroy the wilderness.

## BWCA SPECIALLY TREATED IN STATUTE

Plaintiff's counsel argues that all of the references in the Congressional acts, including the Wilderness Act of 1964 and regulations promulgated thereunder which refer to permissive mineral activities have no application to the BWCA since in the Wilderness Act the BWCA is specifically mentioned, and is the only Wilderness area specifically so mentioned. Since no reference to minerals activity is included in such section, it was not intended by Congress that mineral

activity would prevail or be permitted in the BWCA. Counsel arrives at this conclusion in that 16 U.S.C. § 1133(d)(5) commences "Other provisions of this chapter to the contrary notwithstanding . . ." and goes on to place management of the BWCA under regulations established by the Department of Agriculture ". . . in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area . . . ." It will be observed no mention of mining or mining exploration is mentioned in this section. In attempting to construe the intent of Congress, this argument would seem to have some merit. Further, the sections of the Wilderness Act appearing to authorize mining in National Forests and Wilderness areas refer to the "United States mining laws and all laws pertaining to mineral leasing" 16 U.S.C. §§ 478 and 482 and 1133(d)(3) refer to mining rights in these same terms. Again, this language would seem of assistance in attempting to construe Congressional intent in view of the fact that United States Mining Laws, i. e., staking or locating a claim, have been prohibited on land in Minnesota since 1893, after which 16 U.S.C. §§ 478, 482 and 1133 were enacted. The use of this language further bolsters the argument that BWCA is a special area and should be treated separately.

Further, an inconsistency would appear to arise in that both the 1964 Wilderness Act and the BWCA Regulations speak in terms of "existing" and "reserved" rights and yet the Wilderness Act specifically reaffirmed the Shipstead Nolan Act, 16 U.S.C. § 577a which contains no such exceptions; nor does Executive Order 10092, the air ban order.

The attorney for the Federal defendants refers to the 1969 National Environmental Policy Act, 42 U.S.C. § 4321 et seq. but that Act is so new and became effective after the filing of this action that this court has not based its decision thereon.

## INJUNCTIVE RELIEF

The Federal defendants claim that their administrative process has been thwarted; that the suit is at best premature and that given an opportunity they might or might not issue permits to defendants St. Clair and permit further mineral exploration; that until it is known what they will do, the action is not ripe for decision. The fact is, however, that the Forest Service did permit St. Clair to enter the BWCA and made an exception for him from the regulations as to a base camp; that upon receiving advice that he intended core drilling they did not reject the request but took the view inferentially at least, that if he could establish title it was within the jurisdiction and discretion of the Forest Service to determine whether he should be permitted so to do. Indeed their answer and brief in this proceeding so assert. Their conception is contained in quote from page 10 of their brief:

"As expanded technology has supplied new forms of public transportation and recreation, additional restrictions have been imposed in order to protect the unique character of this area. Most of these restrictions, however, have exempted existing private rights. Throughout the history of the BWCA, outstanding mineral rights have been recognized as one such right."

The case before the court is a declaratory judgment action and no longer an application for preliminary injunction nor temporary restraining order. The court thus need not find an exigency or immediate emergency in order to grant permanent injunctive relief. It is clear to the court that no adequate remedy at law exists if leave for mineral development is granted for the wilderness is lost forever or at least for several generations to come.

## CONCLUSION

Proceeding on the premise that Congress has the right to zone, the question presented, and the one to which

counsel have devoted most of their argument, is whether in fact Congress did intend to zone out of the BWCA Wilderness area specifically any and all mineral exploration and removal.

The task before this court is to divine the fundamental and prevailing intent of Congress from the various acts passed from time to time as above recited and to determine whether it is consistent with the position taken by the plaintiff and the State or that taken by the Federal defendants and/or St. Clair. It seems to the court that the various statutory acts and administrative regulations including the most recent Wilderness Act of 1964, contain within themselves fundamental inconsistencies. A Wilderness purpose plain and simply has to be inconsistent with and antagonistic to a purpose to allow any commercial activity such as mining within the BWCA. A look at the maps stipulated in evidence will reveal that the reserved mineral rights in private hands are situate right in the middle of the BWCA. There can be no question but that full mineral development and mining will destroy and negate the wilderness or most of it. Even any substantial exploratory operation such as core drilling will require a means of ingress and egress,[7] a communications system of some kind, the establishment of various camp sites, the importation of food, clothing, etc., power lines and the modification to a greater or lesser extent of the environment. Should minerals be discovered in commercially productive quantities and be amenable to open pit mining as in other locations in Minnesota or as in taconite sites, the purpose and values of almost the entire BWCA is lost. The same is true, but to somewhat lesser degree, should any mining be done in the conventional underground method. In either event, access as by railroad, or highway is necessary, areas of timber must be logged off, a water supply must be obtained and other wilderness interferences effected.

Congress itself defined a "wilderness area" in 16 U.S.C. § 1131(c):

"A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation . . . .."

It is clear that wilderness and mining are incompatible. Wilderness exists because man has not yet intruded upon it. As the United States was settled and frontiers vanished, wilderness disappeared except for inaccessible or otherwise then commercially useless areas. As of today but few true wilderness areas remain. Once penetrated by civilization and man made activities, it cannot be regained for perhaps hundreds of years. The recovery period is meaningless for generations to come. The destruction is irreversible. So with mining, logging off and other activities, they are anathema to all wilderness values. Congress in the Wilderness Act, for instance, 16 U.S.C. § 1133(d)(2) above quoted, refers to mineral prospecting "if such activity is carried on in a manner compatible with the preservation of the wilderness environment." Other

---

7. Heavy machinery can hardly be brought in by canoe or foot, particularly with the necessary portages, nor can substantial quantities of material be removed without other means of transport.

portions of the Act and the regulations use language of a similar import.

If the premise is accepted that mining activities and wilderness are opposing values and are anathema each to the other, then it would seem that in enacting the Wilderness Act Congress engaged in an exercise of futility if the court is to adopt the view that mineral rights prevail over wilderness objectives. A mineral resource developer cannot proceed without making use of the surface of the land. Any use of the surface for the exploration or extraction of minerals becomes an unreasonable use because the surface is no longer wilderness and is irreversibly and irretrievably destroyed for generations to come. Mineral development thus by its very definition cannot take place in a wilderness area; else it no longer is a wilderness area. It is of course necessary that mineral owners disturb the surface in order to enjoy the mineral estate. Generally and absent zoning or restrictions, a mineral owner may make a reasonable use of the surface. One has to reach the conclusion however that if the area is to remain true wilderness, there is no reasonable usage to which the surface can be put and still retain the area's character as wilderness. An open-pit mine for instance or an underground mine with resultant piles of slag or refuse and all equipment needed can never reasonably be undone. There is an inherent inconsistency in the Congressional Act and it falls in the lap of the court to determine which purpose Congress deemed most important and thus intended. In this court's opinion the Wilderness objectives override the contrary mineral right provision of the statute (and of necessity the regulations promulgated pursuant thereto). Otherwise, the Congressional Act is a nullity. It does not seem to this court that it can presume that Congress intended a nullity. Congress demands that the Wilderness remain inviolate and yet at the same time appears to allow mineral development. Which use should be paramount is the court's problem. To create wilderness and in the same breath to allow for its destruction could not have been the real Congressional intent and a court should not construe or presume an Act of Congress to be meaningless if an alternative analysis is available. The court is aware of the general rule of construction that the specific controls the general and that the provision relating to mineral rights are more specific. Nevertheless, if the Act means anything, the BWCA was established by Congress to secure for future generations the beauty, pristine quality and primitiveness of one of the few remaining small areas of this Country.

It is argued that mere prospecting and drilling is in the nature of a minor interference. It is nevertheless an encroachment upon wilderness, what with its heavy machinery, the noise of its operation, necessity for water or land transportation, base camps, communication lines, etc. Further, prospecting is only worthwhile if something is found, and it would follow as an *a fortiori*, that removal of the ore is the next step requiring further encroachment and as this court stated earlier knocking out the very heart of the BWCA.

The State requests that the injunction lie "except as related to a national emergency." It contemplates the time may come "when it is apparent that mineral values are of such great public importance that the need for them cannot be ignored in the public interest". The difficulty the court has with this concept is one of definition. The terms are so broad that to include this in an injunctive decree is merely to breed a further law suit. It is not clear whether the "national emergency" would constitute for instance, a declaration of war by Congress, a civil uprising at home, or merely a shortage of metals requiring imports to meet local needs. If the term were "national survival" it might be more capable of definition, but even that is or would be a matter of judgment at some time in the future. Presumably any definitive action by Congress in relation to BWCA or other wilderness areas unequivocally determining that

the objectives and value of wilderness are to be relegated and secondary to mining interests and activities whether or not a "national emergency" exists will be controlling. Theoretically a "national emergency" could be extant having no particular relationship to mineral interests i. e., extensive destruction by floods, tornados, pestilence, etc. Congress can define and prescribe, but until it does so, for the reasons above, the court declines to attempt to carve out a "national emergency" exception to the injunction.

A separate permanent injunction order has been entered.